Cuma, per
Nott, J.
It appears from the proceedings in this case, that the bond in question was given to the Commissioner, for the purpose of securing the payment of the money arising from the sale of the Silver Bluff to such person as upon investigation before him should appear to be entitled to receive it. Upon that investigation *292 it appeared that all, except a part of the first instalment, was due to the estate of Thomas Galphin deceased. How this claim of GalpMn’s arose does not very dis-tinctly appear; and perhaps^ it is not necessary that it should in the investigation of the question now under consideration.
this state "are assets for the payment of debts; and given his bond with a security to the erfora'sum1" d“e on a purchase at his sales, which reference appeared to belong to the estate of his the^exeeutor afterwards tained an order of Court bond'deiiver-ed up tp him, thaTthe sure-by 'dischai-ged from liability the executor solventabas" the executor rightto1re-the bond, and canceut.t0
The bill states that the money was due to the heirs of Galphin; and being the proceeds of the sale of land, it occurred to the Court, at the argument of the case, that perhaps it ought to be considered as the real estate of Galphin, which should be paid to the heirs and not to the executor. That doubt created the only- difficulty ' ¶ which has arisen in the case. But I am not prepared to that it would have altered the. result. For lands are assets in the hands of executors for the payment of debts. , 4 . And if it were clearly ascertained that this money ought to considered as a part of the real estate of Galphin, and that the Court of Equity thought proper to order it to be 4 ^ ¶ ¶ « a paid over to the executor for the payment or the debts ot foe estate, I am disposed to think that it ought to exone-ra(e the security. However, I am satisfied that that ques- .... , , . . . ^ tion cannot arise in this case ; and therefore it is not neces-sai7 to express any opinion upon .it. The bill barely that the money was due to the heirs of Galphin, . , . . . but it does not state how that claim arose; nor was any Pro°f °f the fact offered to the Court. On the contrary, the bill further states, or rather it appears from the first decree in the case, that complainants’ ancestor had sold ^an<^ ^o B-amsays and Goodtoyn.'- Besides, it has not been, contended in the argument that it ought to be considered as real estate; nor has the decree put it on that footing. .
. It appears therefore, from all the circumstances of the case, that the money was due to the executor of Galphin, not to ^e‘rs- Barmy M’Kinney, the. defendant and purchaser of the land; was the executor of Galphin, so that the money was actually due to himself. Being *293 so entitled he applied to the Court of Equity to have the bond delivered up to him, which' was accordingly done. It will not be denied, that prima facie the executor is entitled to all the funds of the estate. The testator had placed that confidence in him, and no reason has presented itself to my mind why the Court should not ? As the whole matter was within the jurisdiction of the Court, and the executor being the proper person to receive the money, it would appear perfectly consistent with the relation of all the-parties that the bond should be delivered up to him.
No collusion between the executor and surety proved, or fraud on 'the Court on the part of the executor.
But the ground of relief relied on is, that he procured the bond to be delivered up. by fraud. It is difficult to conceive how a man can be guilty of fraud in obtaining what is his own. Suppose Galphin himself had been alivé and had purchased the land, would not the Court have ordered the land to be delivered up to him when it was ascertained that the money was due to himself1? And has not the executor the same right"? Suppose any other person had been the purchaser, would not the Court have ordered the money to be paid over to M’Kinney, or the bond to be assigned to him for collection'? But where is the evidence of fraud? The only witness to that part of the case is the Commissioner, Mr Brooks. The whole of his testimony in relation to M’Kinney is, “ that Mr M ’Duffie, on his behalf, obtained an order to have the bond delivered up. It was an ex parte application. The Galphins were not present.”. I do not observe in this testimony any appearance of fraud. It is not pretended that there was any misrepresentation. The grounds on which the motion was predicated, if any were stated to the Court, do not appear. It is probable that the Court considered him as executor entitled to thp money, and therefore ordered the bond to be delivered up on that ground alone. It may perhaps have been stated that the estate was involved, and the money was *294 required to relieve it from those embarrassments. The game js now stated, and the contrary does not appear. The complainants, it is said, were not present, nor had any not‘ce °f the application. But the executor was under no necessity to give them notice. Suppose the money had been lying in bank, he might have taken it out without giving notice to the heirs. Suppose an action had been brought on the bond, they would not have been parties, and. a verdict for the defendants would have been a perpetual bar to their claim. The heirs need never be made parties, or have notice of any suit relating exclusively to the personal estate. An heir is never made a party where an executor is sued at law. If an executor plead plene administravit, the plaintiff need not controvert it; he may reply that there are lands, and the Court will order the lands to be sold to satisfy the debt without making any inquiry into the truth of the plea. The heir may afterwards call the executor to account, and shew that he had not fully administered; but that will not affect the creditor or purchaser. In the case of D’Urphey v. Nelson, it appeared that an action had been brought against the administrators of H5 Urphey ; they had neglected to plead plene administravit, and had thereby admitted assets in their hands. The plaintiff took judgment and issued execution against them; but not being able to find any goods and chattels on which to levy, he levied on the land of D’Urphey, and had it sold. It was purchased by Nelson. An action -was brought by the bQb's °f D’Urphey against Nelson for the land. The Court held that the proceedings were regular, and that ^an<^s were assets in the hands of administrators, and were as liable to be sold under, a Ji. fa. as the personal estate. The case under consideration is still stronger. The order for the delivery of the bond was the immediate act of the Court, and not of the party. The Court was not deceived, because it was not pretended that the *295 heirs of Galphin had notice. After the closest examination I have not been able to discover a scintilla of fraud on the part of M ’Kinney.
An heir at er'bemadeT party or have notice of any suit relating exclusively to the personal estate of a deceased person.
If the executor plead jplene admin-istravit at law, and the plaintiff replies that there are lands, the Court will order them to be sold without inquiring into the truth of the plea.
Lands may a^!/«. Under minktrato ad" although he-pkne^dndn-istravit. •
*295 Let us now examine the facts in relation to Brei-thaupt. With regard to him also Mr Brooks is the only witness. He does not even know “ that Breithaupt was in the state when the order was made. He thinks he was present, hut is not certain. Breithaupt was. the agent of Poinset, at whose instance the land was sold when it was purchased by M’Kinney. He was also the agent of Reid and Boyd, to whom it was afterwards sold. Breithaupt knew all these proceedings, and was the master spirit. M’ Kinney is now insolvent; and the complainants’ only resource is against Breithaupt.” That is all the evidence against Breithaupt. There is something high sounding in the words master spirit, as if some meaning was lurking under them, which has not been developed, and therefore is left to be inferred. But we cannot condemn a man as guilty of fraud, without evidence somewhat more satisfactory than this. Colonel Breithaupt was indeed acquainted with all the circumstances connected with the transaction. He was the agent of Poinset, to foreclose whose mortgage the land was sold to M’Kinney. The money however, which was paid at the time of the sale, discharged that defendant, and there was an end of his agency. He then became security for the payment of the balance of the money, and a mortgage was taken as a further security for the same. But he had no agency or interest in that part of the transaction. The land was afterwards mortgaged by Jfcf ’Kinney to Beid and Boyd, to secure a debt due by him to them. But that was not done until after the bond was delivered up, and Breithaupt released from all responsibility, as he then supposed. He was then appointed the agent of Reid and Boyd, for the purpose of taking a mortgage of the land to secure their defendant, and was also their agent when it was afterwards sold to *296 satisfy that mortgage, and received the money for them. He may indeed have been their agent before, but it does not appear to me that it would aifect the question. He could not accept a mortgage for the land, while he knew it was under another incumbrance.
If no fraud in obtaining will discharge the surety.
Where equi-not interfere.
He might safely do it when that was removed ; and it is not improbable that that was one of the objects of M’Kinney in obtaining an order for his bond to be delivered up. But admitting the fact to be so, it furnishes to my view no evidence of fraud. M’Kinney wished to secure the debt to Reid and Boyd, and -perhaps had no other effectual means of accomplishing the object but by mortgaging this land. It was important to him therefore to remove that incumbrance. But he resorted to no subterfuge or deception to effect it. It might have been an incautious order in the Court, but still the defendant is entitled to the benefit of it. And even if the motive in obtaining the order could be any evidence of fraud in M’Kinney, it could not be visited on Breit-haupt. It will be observed, that the ground of complaint is a fraud practised on the Court, and not a fraud in the executor of the estate of Galphin. These are two distinct questions. Admitting for instance that M’Kinney was actuated by the most fraudulent views in getting up bond, (of which however I do not see any evidence) and admitting he has most wantonly wasted the estate, (of which there is as yet no proof) if he has practised no ¿eception 0n the Court, the order of the Court will protect the surety. And it is most manifest that there was not one material fact connected with the transaction which was not as well known to the Court that made that order as to either of the parties to be affected by it. The error therefore was in the Court, if any error there was, and not in this defendant. And he certain-even in that point of view, has as strong an equity on t[je court under whose authority he acted as the *297 complainants can have j and where the equities are equal the Court will not interfere. It is by the act or order of the Court that he has been deprived of his indemnity; and surely that same Court will not make him liable tor an act oí its own. ,
creditor to from the Plin?;Pal: and time is given, it will exone[yto flie sme*
at law, giving day to the principal ^“exomí the sure-
the Jatheofficer1 of the-Court, lppiy7otythey and if the by an*execu-Court te delivered ecutorupon". which the heirs and requiringNot th.?,se vent the dis-surety if the* bo“d,ls deli" vered up.
But let us now examine that order and see whether it was, as Mr Brooks seemed to think it, a very “extraordinary order.” If the bond had been payable to a private individual, Colonel Breithaupt vyould have had a right to apply to the obligee to enforce the payment the money by the principal; and if he had then ed the time of payment it would have exonerated the surety. That I take it now is an established princi-.J ■ . r pie rn the Courts of Equity. Burn v. Administrators of Poaug, 3 Desaus. Rep. 604. Gifford’s Case, 6 Ves. 809. Rees v. Berrington, 2 Ves. Jun. 542. Nesbit v. Smith, 2 Bro. C. C. 579. Even at law giving day to the principal - will in many cases exonerate the surety, English v. Darley, 2 Bos. & Pul. Rep. 60. Clark et al. v. Devlin, 3 Bos. & Pul. Rep. 363. The King v. The Sheriff of Surrey, 1 Taunt. 159. Bowsfield v. Toweer, 4 Taunt. 458.
Suppose Colonel Breithaupt had come into Court and insisted upon having suit brought against the principal, or that he should be exonerated ; what could the Court have done ¶ It could not have kept the funds of an embarrassed estate locked up in its own coffers, out reach of the executor. If it had extended the credit to the principal it would have exonerated the surety. It would therefore have done precisely what it has done this case, viz. “ order the bond to be delivered up.” To be sure the Court might have required terms which would have secured the heirs and legatees in the event of a mal-adminisfration on the part of the executor ; but that was a matter for the consideration of the Court, and not for these defendants. I have now examined this part * *298 of the case with the attention which appeared to me due to the novelty and importance of the question. ' And the result of my investigation is, that there was no such evidence of fraud in the transaction as to render either of the defendants liable on that ground.
When the Court places the fund again into the hands of the principal it discharges the surety.
But the Chancellor does not place the' case on the ground of fraud at all. . “ The order of Court, it is said, directing the delivery of the bond to C. M’Kinney, as the executor of the estate of Ccalphm, was not intended to operate as a discharge of the debt, for there was no proof of payment made ; nor was it put to the Court that in making that order it was intended to cancel the bond and release the surety.” With the most respectful deference for the opinion of the learned Chancellor who delivered that decree, I cannot bring my mind to concur in that construction of the order. Delivering the bond to the obligor must of itself imply an intention to place it entirely at his disposal. What' other intention can possibly be conceived ¶ It is said, “ it was delivered to him as executor eo nomine, for the benefit of the estate, and if he destroyed it he was guilty of a breach of trust.” If it was delivered to him for the benefit of the estate, it was for the purpose of enabling him to appropriate the money due upon it to the payment of the debts and,legacies of the estate. It was then giving the entire credit to the principal; and the Court would violate its own rules not to construe it into a release of the surety. The destruction of the bond was no, breach of trust, because being in the hands of the obligor it became a dead letter. The misapplication of the fund might have been a breach of trust; but Bréithaivpt was not answerable for that. He was not security for the faithful administration of M’Kinney. But if the order to deliver the bond did not of itself import a discharge of the debt, the release of the money due on the first instalment was an unequivocal expression of such intention. I think therefore, *299 that Colonel Breithaupt had a clear and undoubted right to considér himself as released from that bond. And eyen if there had been any thing ambiguous in the order, I think the Court considering it as its own ° act ought to construe it most liberally in behalf of the surety. It is said, that if Colonel Breithaupt consented to give up the mortgage which was his own indemnity, lie must take the consequences of his own indiscretion. But there is no evidence that the mortgage was up by the consent of Colonel Breithaupt. It was the voluntary act of the Commissioner, who would not have asked his consent, and which he had no right to oppose. The Commissioner, I think very correctly, considered the mortgage as an incident to the bond, and as the principal was destroyed the incident went with it. Green v. Hart, 1 Johns. Rep. 580. Runyan v. Mersereau, 11 Johns. 534.
The Court should con-actTmost li” surety,
The mere loss of a bond w¡n not dis-the
And I think that the same principle which would make Breithaupt liable on the bond would make the Commissioner liable to him for depriving him of his security by giving up the mortgage. Now' if Breithaupt should file a bill against the Commissioner for giving up that mortgage by which he became liable to pay the debt out of his own estate, would not-that order of Court be his protection 1 And if a protection to him, why not to Breithaupt? "
That the mere loss or destruction of a bond will not ,. , . .... ... . discharge a surety is a proposition too plain to require authority in its support. That is not the ground on which the defendant rests his defence. But it is, .that he has been discharged by the bond having been delivered up, to the principal obligor, who was entitled to recover the monéy due upon it. That it was ordered to be delivered up by a Court of competent jurisdiction, with a full knowledge of all the facts and circumstances. That he has thereby been deprived of the indemnity which he *300 then had. And that he ought not to suffer by an act of the Court, in which he had no agency, over which he had no control, and in opposition to which he had no right to interfere. That if the same thing had been asserted on his own application, it would have been nothing more than he had a right to ask, and what the Court would not have refused without affording him some other adequate protection. Sureties are always looked upon with peculiar indulgence in a Court of Equity; and it apjpears to me that it would be treating Colonel Breit-hmpt with unprecedented rigour to set up the bond against him. I think therefore, that the decree against him ought to be reversed, and the bill as to him dismissed with costs.

Decree reversed.